UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CRYSTAL LARRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11 C 2090 |
| v. | ) | |
| | ) | Magistrate Judge Geraldine Soat Brown |
| BAGCRAFT PAPERCON I, LLC | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Crystal Larry ("Larry") brought this lawsuit against her former employer Bagcraft Papercon I, LLC ("Bagcraft") under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, alleging sexual harassment as well as retaliation for reporting the harassment and filing a charge with the Equal Employment Opportunity Commission ("EEOC"). (Compl.) [Dkt 1.][1] The court has subject matter jurisdiction over Larry's claim under 28 U.S.C. § 1331. The parties consented to the jurisdiction of the magistrate judge. [Dkt 10.] Before the court is Bagcraft's motion for summary judgment. [Dkt 28.] For the reasons that follow, Bagcraft's motion is granted.

---

[1] Larry also brought counts against Bagcraft for disability discrimination under the Americans with Disabilities Act and for race discrimination in violation of 42 U.S.C. § 1981, but voluntarily dismissed those counts with prejudice on January 19, 2012. [Dkt 25.]

1

## BACKGROUND

Bagcraft, located in Chicago, Illinois, is engaged in the business of manufacturing paper and wax food bags for supermarkets and carry-out restaurants. (Pl.'s LR Resp. ¶ 2.)[2] Larry was employed at Bagcraft as a Production Associate (Machine Operator) from 1989 to 2010. (*Id.*) Larry worked the 7:00 a.m. to 3:00 p.m. shift at Bagcraft's production plant, taking over her assigned machine from the previous shift worker at the beginning of each shift and turning it over the next worker at the end of the shift. (*Id.* ¶ 3; Def.'s LR. Ex. 2, Dep. Crystal Larry at 93-94.)

Bagcraft maintained an Equal Employment Opportunity and Non-Harassment Policy prohibiting, among other things, sexual harassment in the workplace. (Pl.'s LR Resp. ¶ 14.) The

---

[2] Unless otherwise noted, the following facts are taken from the parties' statements of fact filed pursuant to Local Rule 56.1, which are cited as: "Def.'s LR Stmt. ¶ __" [dkt 31], "Pl.'s LR Resp. ¶ __" [dkt 39], "Pl.'s LR Add'l Facts ¶ __" [dkt 41], and "Def.'s Resp. Pl.'s Add'l Facts ¶ __" [dkt 47]. Exhibits submitted to support those statements are cited as "Def.'s LR Ex. __" [dkt 32], "Pl.'s LR Ex. __" [dkt 40], and "Def.'s Reply Ex. __" [dkt 48].

Larry's Local Rule 56.1(b) Response does not comply with Northern District of Illinois Local Rule 56.1 or this court's standing order on summary judgment motions. First, Larry did not respond to each of Bagcraft's statements of fact with a summary of the paragraph to which it was directed. Second, Larry mixed statements of additional facts and legal argument in a number of her responsive paragraphs, despite Local Rule 56.1's requirement that the opposing party submit a separate statement of additional facts and this court's standing order that responses to fact statements not contain argument. Bagcraft was granted leave to file a reply brief in excess of 15 pages based on its argument that Larry's noncompliance with the Local Rule necessitated more space for it to respond. (Order, May 18, 2012 [dkt 46]; Def.'s Mot. [dkt 43]).

Many of Larry's responses to Bagcraft's statements responded to only part of the statement and ignored the remainder, or simply denied certain statements without citing contrary evidence. (*See, e.g.,* Pl.'s LR. Resp. ¶¶ 5, 10, 16.) All factual statements set forth by the moving party are deemed admitted unless properly controverted by the non-moving party with citations to evidence in the record. LR 56.1(b)(3)(C); *Rao v. BP Prods. N. Am., Inc*, 589 F.3d 389, 393 (7th Cir. 2009). It is the parties' obligation to present evidence to support its position. The court is not required to search the record to find evidence. *Haney v. Speedway SuperAmerica*, 526 F.3d 1099, 1104 (7th Cir. 2008).

harassment policy prohibits "unwanted sexual flirtations" and "offering or implying to offer employment benefits in exchange for sexual favors." (*Id.*)[3]  The harassment policy describes the complaint procedures and management responsibilities.  (*Id.*)  Larry received training on the harassment policy and procedures on May 12, 2010.  (*Id.*)

### A.      Larry's Interactions with Jazon Carreon

In March 2009, Larry began reporting to shift supervisor Jazon Carreon.  (Pl.'s LR Resp. ¶ 4.)  Carreon reported to the Production Manager Ed Laywell, who in turn reported to the Plant Operations Manager Patrick Lueth, the top manager at the Chicago plant.  (*Id.*)  Carreon was responsible for ensuring that daily production goals were met.  (*Id.*)  His duties included assigning employees to the machines based on Bagcraft's production schedule, conducting employee reviews, and managing day-to-day operations.  (Pl.'s LR Ex. 5, Dep. Patrick Lueth at 28-29.)  Carreon had the authority to issue verbal disciplinary warnings to employees, but he did not have the authority to independently hire, fire, promote, demote, or discipline the employees he supervised.  (Pl.'s LR Resp. ¶ 5.)

Larry testified that, over a six-week period in March and April 2009, Carreon hung around her machine, told her she smelled good and that he would buy her perfume, and asked her if she had ever dated a Mexican man.  (Larry Dep. at 201-08.)  He told her that could "make things easier" for her.  (*Id*. at 203.)  Larry reported to Laywell that Carreon was sexually harassing her and that she wanted the behavior to stop.  (*Id*. at 210-11.)  Larry admits that she did not give Laywell specific

---

[3] This policy is titled "Packaging Dynamics: Equal Employment Opportunity."  (Def.'s LR. Ex. 14, Decl. Julie Wisniewski, Ex. G.)  Packaging Dynamics is apparently Bagcraft's parent company.

examples of the harassment. (*Id*. at 211.) According to Larry, Laywell told her that Carreon was new and to "give him a little time." (*Id.* at 210.) Larry testified that the objectionable behavior stopped between April 2009 through November 2009. (*Id.* at 211-12.) However, Larry testified, not long after she complained to Laywell, Carreon moved her out of the department she was working in and denied her overtime work. (*Id*. at 208, 213-14.) Larry did not file any union grievances with respect to Carreon's actions in 2009, and did not bring any complaints to Bagcraft's Human Resources department about sexual harassment in 2009. (*Id*. at 220-221.) Carreon's behavior did not prevent Larry from doing her job. (*Id*. at 209.)

Larry testified that for several months, Carreon did not engage in any conduct that Larry considered offensive, but then in November 2009, Carreon again complimented her on her cologne. (*Id*. at 206-12.) She also testified that in March 2010, Carreon said he liked her, offered to get her the day off for her birthday and asked if he could take her out, which she refused. (*Id.* at 242-43.) He also said that he liked her hair, but she did not find that harassing. (*Id*. at 244-45.) Carreon told a co-worker, Dwain Davis, that Larry was "his girl," but Larry and the co-worker laughed. (*Id*. at 246-47.) Carreon also spoke Spanish around Larry even after she told him she did not understand it, and he offered to teach it to her which she does not consider harassing. (*Id.* at 250-51.) Carreon asked her to come in and work overtime on days that he was working, but she declined. (*Id*. at 252-53.) In April, he complimented her on the color of her shirt while looking at her breasts. (*Id*. at 253-54.) She also testified that he stared at her breasts and said, "Hmmm." (*Id*. at 187.)

Larry's co-worker, Dwain Davis, testified that he observed Carreon hanging around Larry's machine "too often" but he does not know what Carreon and Larry were talking about. (Pl.'s LR Ex. 7, Dep. Dwain Davis at 19.) Davis heard Carreon say that he "loved the way [Larry's] blouse looks

on her," and that she was his (Carreon's) favorite. (*Id*. at 9-11.) On one occasion, Larry complained to Davis that Carreon said she was his girlfriend, and Davis heard Carreon say that Larry was his "girlfriend," but Davis did not tell Joe Sims, the union representative, that he heard that. (*Id*. at 6, 11, 22.) Davis does not recall Larry saying that Carreon asked her out. (*Id*. at 19.) Davis observed that Larry was moved around a lot while others were not. (*Id*. at 7.) Initially he testified that he viewed that moving around as giving Larry "a hard time," but later changed his mind. (*Id*. at 7-8.)

Larry admitted that Carreon's actions did not interfere with her ability to continue working and carry out her job duties. (Larry Dep. at 251, 254-55.)[4] Carreon never touched Larry in a sexual or harassing manner. (Pl.'s LR Resp. ¶ 12; Larry Dep. at 181-82.)

### B.    Larry's Complaints About Carreon

Larry testified that she approached Julie Wisniewski, the Human Resources Manager, in March or April 2010 complaining that Larry had twice looked at her breasts instead of talking with her, and it made her uncomfortable. (Larry Dep. at 257.) Bagcraft asserts that the first time Larry complained to Human Resources was May 25, 2010. (Def.'s LR Stmt. ¶ 15.) The parties agree that on May 25, 2010, Larry made a complaint to Wisniewski about Carreon's behavior. (Pl.'s LR Resp. ¶ 15.) According to Wisniewski's report, Larry complained that Carreon sexually harassed her because he stared at her chest, and on one occasion said he liked how her shirt looked on her. (Pl.'s LR Ex. 10, Wisniewski Report at B0440.) Larry further complained that Carreon sometimes spoke in Spanish and moved her from machine to machine. (*Id*.) Larry did not identify any witnesses to

---

[4] Despite this testimony, and without any supporting record citation, Larry's Local Rule 56.1 response denies Bagcraft's statement that Carreon's actions did not interfere with Larry's work. (*See* Pl.'s LR Resp. ¶ 10.)

the alleged harassment. (Pl.'s LR Resp. ¶ 15.)

Wisniewski interviewed Carreon on May 25 about Larry's complaint. (*Id.* ¶ 16.) Carreon stated that he commented on the color of Larry's shirt because he had a running shirt of a similar color, but Larry testified he never said anything to her about a running shirt. (Def.'s LR Ex. 5, Dep. Jazon Carreon at 43; Larry Dep. at 260.) Wisniewski then met with Carreon and Lueth to address Larry's complaint, during which Wisniewski and Lueth advised Carreon that his comment about the color of Larry's shirt was not a violation of the harassment policy but directed him to limit future discussions with Larry to work-related topics. (Pl.'s LR Resp. ¶ 17.) On May 26, Wisniewski informed Larry that her complaint had been investigated and did not "rise to the level of a policy violation" and that she should report any future complaints. (*Id.* ¶ 18.) At some point, Wisniewski called Carreon into a meeting with Larry to explain to Larry how the machine and department assignments were made. (*Id.* ¶ 19.)

In June 2010, Larry approached Wisniewski to add to her complaint of sexual harassment, and Wisniewski asked her to describe her complaints in writing. (*Id.* ¶ 20.) Larry presented a written statement of the alleged harassment to Wisniewski on June 16, 2010, which she intended to be an accurate and complete description. (*Id.* ¶¶ 21-22.) It is not clear from the parties' presentation of the facts whether that statement is contained in the record, although there is a two-page written statement by Larry with that date on it among her exhibits. (Pl.'s LR Ex. 6.) In that statement, Larry complained that Carreon, on unspecified dates, asked her if she ever dated a Mexican man, told her they have the "same blood running through our vein[s]," told her how good she smelled, told her that her shirt brought out the color of her eyes and on another occasion told her she was wearing his "favor[ite]" shirt, told her how well she was doing on all the machines he put her on, told her he

6

could get her the day off on her birthday, spoke to her in Spanish even though she told him it made her uncomfortable, and told a co-worker she was his "girl." (*Id.*)

Wisniewski met with Larry on June 16 and went over the written allegations. (Pl.'s LR Resp. ¶ 22.) Larry was not able to identify specific dates for her allegations. (*Id.*) Larry identified Dwain Davis as the only witness. (*Id.*) Wisniewski interviewed Davis, who she says reported that he had not witnessed any such activity. (*Id.* ¶ 24.) Davis testified in his deposition that he told Wisniewski that Carreon did not treat Larry any differently from any other employee and that he did not think there was anything wrong with Carreon's comments to Larry. (Davis Dep. at 53.)

Wisniewski met with Carreon on June 16 and went over Larry's allegations line by line. (Pl.'s LR Resp. ¶ 23.) Carreon denied Larry's allegations for the most part, but admitted that he did say that they had the same blood running through their veins; however, that it was in response to Larry stating to him that she did not think he liked black people. (*Id.*; Def.'s LR Ex. 5, Carreon Dep. at 77-80.) Carreon denied asking Larry if she had dated a Mexican man. (Wisniewski Report at B0442.) Carreon reported to Wisniewski that after an employee teased him about Larry being his "girlfriend" because he was nice to her although she was rude to him, he said that he liked all the female employees and that they were all his "girlfriend." (*Id.*) He did not recall telling Larry he would make things "easier" for her, but stated that he frequently tells employees to let him know if they need additional help. (Def.'s Resp. Pl.'s Add'l Facts ¶ 5.)

Wisniewski found Carreon's answers to be clear, consistent, and non-hesitant. (Pl.'s LR Resp. ¶ 23.) Wisniewski thereafter concluded that there was no violation of the harassment policy, and informed Larry of this on June 17, 2010. (*Id.* ¶ 25.) Wisniewski asked Larry to report any future comments or actions she found inappropriate or harassing. (*Id.* ¶ 26.) Larry submitted no further

report or complaint to Bagcraft about Carreon's behavior.  (*Id.*)

Larry filed an EEOC charge on July 28, 2010 alleging sex discrimination, disability discrimination, and retaliation.  (Pl.'s LR Ex. 14, EEOC Charge.)  Bagcraft received the EEOC charge on August 23, 2010.  (Defs.' LR Reply ¶ 89 (*sic*).)

### C.    Bagcraft's Disciplinary Actions Against Larry

#### 1.    *Walking away from her machine*

Prior to April 2010, it does not appear that Bagcraft took any significant disciplinary action against Larry.  (Def.'s LR Reply ¶¶ 1-2.)  On April 6, 2010, Larry was assigned to work on Machine 132 when she began her shift, but was then directed by Lueth to work at Machine 86.  (Pl.'s LR Resp. ¶ 28.)  Larry admits that she walked away without seeking permission or telling anyone she was leaving, which she testified she did in order to go to the locker room to get keys she needed to open her toolbox.  (Larry Dep at 383-85.)   Bagcraft has workplace conduct guidelines set forth in a document entitled "Guidelines for Personal Conduct," on which Larry had been trained.  (Pl.'s LR Resp. ¶ 27.)  The guidelines provide that leaving the work area without permission is a Level 2, or "very serious" infraction.  (*Id.*)  After Larry left her work area, Lueth directed Ed Novak, a supervisor, to issue Larry a written warning for leaving her work area without permission.  (*Id.* ¶ 29.)  After Larry filed a union grievance, the discipline was reduced to a verbal warning.  (*Id.*)

#### 2.    *Parking in the corporate parking lot*

In May 2010, as part of planning for plant evacuation procedures, Wisniewski questioned

Larry about the handicapped parking placard she had in her car. (*Id.* ¶ 30.) Wisniewski apparently asked Larry if the sticker was hers and told her Bagcraft would need a note from her doctor about her physical limitations. (*Id.*) Bagcraft thereafter sent Larry a letter on May 21, 2010 that stated, in part:

> In the state of Illinois you must have an arthritic, neurological, or orthopedic condition that severely limits your ability to walk in order to qualify for a disabled parking permit. If this is the case and your ability to walk is severely limited, you must report your restrictions to the Company. We cannot allow someone to work who we believe may be in violation of their physician's orders . . . .

(*Id.*; Pl.'s LR Ex. 19.) Larry provided a note from her physician stating that he had signed off on the application for the placard due to Larry's "left lower extremity pain," but that Larry could perform her usual work duties. (*Id.* ¶ 31; Pl.'s LR Ex. 20.) Larry did not ask for any job modifications or accommodations. (*Id.* ¶ 31.)

Larry had been parking in the corporate (non-production) parking lot, located closer to the building than the lot in which production workers parked. The corporate parking lot is reserved for Bagcraft non-production, corporate office employees, company visitors and guests. (Pl.'s LR. Resp. ¶ 33.) Another production employee who had been parking in the corporate parking lot using a handicap sticker also received the same letter that Larry received, and she stopped parking in that lot. (Pl.'s LR Ex. 8, Dep. Joe Sims at 100-101.) Larry continued to park in the corporate lot after her conversation with Wisniewski. (Larry Dep. at 154.) When she handed the doctor's note to Wisniewski, she did not ask directly if she could continue to park in the corporate lot, but asked, "Is there any other problem?" (*Id.*) Larry assumed that Wisniewski knew Larry was parking there. (*Id.* at 156.) Wisniewski testified she told Larry she had to park in a handicapped spot specifically designated for her in the production parking lot. (Wisniewski Dep. at 123-24.)

9

On July 26, 2010, Lueth observed Larry parking in the corporate employee lot, and approached Larry before her shift started to tell her to move her car to the production employees' lot. (Pl.'s LR Resp. ¶¶ 33-34.) Larry admits that she did not do so. (*Id.*)

Around mid-morning, Lueth asked Laywell to follow up with Larry about the car, and Laywell directed her to move the car to the production lot. (*Id.* ¶ 35.) Larry testified that, rather than moving the car, she questioned Laywell, who told her that she had a specially marked space reserved for her in the production employees' lot. (*Id.*) Larry admits that she did not move her car, and that a short time later, Laywell returned and told her again to move the car, threatening that the car would be towed if she did not move it. (*Id.* ¶ 36.) She still did not move it. (*Id.* ¶ 37.)

Later that day, Lueth and Laywell approached Larry's Union Steward Joe Sims, and the three of them had a meeting with Larry and Wisniewski that same day. (*Id.*) There are differing versions of this event. Larry testified that Laywell asked her if she had moved the car, and she said "No. I didn't move my car. What is the problem?" (Larry Dep. at 166-67.) She said that she had been parking in the non-production lot and no one said anything until that day. (*Id.*) Lueth and Wisniewski testified that Larry responded in a loud and argumentative manner that she did not have to move her car. (Pl.'s LR Ex. 5, Dep. Patrick Lueth at 108; Wisniewski Dep. at 137.) Wisniewski testified that Larry told management, "[T]ow my vehicle; go ahead and tow it." (Wisniewski Dep. at 137.) According to Larry, Lueth then said, "I want you out. I want you terminated." (Larry Dep. at 167.) Sims testified that Lueth yelled "I just want her out of here." (Sims Dep. at 108.) Lueth and Wisniewski both testified that Lueth did not say that. (Lueth Dep. at 110; Wisniewski Dep. at 138.) Lueth issued Larry a written warning for insubordination, and threatened that he would suspend her if she continued to argue rather than move her car. (*Id.* ¶ 38; Def.'s LR Ex. 10 at DX

10

13.)  Insubordination is a Level 3, "extremely serious" infraction under Bagcraft's guidelines.  (*Id.* ¶ 27.)  Sims said to Larry, "Move the car," and she did.  (Sims Dep. at 109.)

3.    *Refusal to work assigned overtime.*

In summer 2010, Bagcraft experienced a spike in customer demand and began assigning significant amounts of overtime.  (*Id.* ¶ 39.)  Pursuant to the collective bargaining agreement in place between Bagcraft and the production employees, overtime was to be "rotated on a seniority basis." (Pl.'s LR Ex. 25, Art. 2, para. 5 ("CBA").)  Sims stated in a declaration that the policy of Bagcraft was for a supervisor to offer the overtime to employees on his shift in order of seniority,  and if the shifts were not all taken when he got to the bottom of that list, to go back up the list in order of the least senior to assign them mandatorily.  (Pl.'s LR Ex. 17, Decl. Joseph Sims ¶ 2.)  Bagcraft characterizes the procedure differently, stating that the CBA and Bagcraft procedures were such that overtime opportunities were posted and employees at any seniority level were free to volunteer for them by signing up, and those unfilled slots were assigned involuntarily in order of reverse seniority. (Def.'s LR Stmt. ¶ 39.)  Both agree, however, that the unfilled overtime slots could be filled by mandatory assignments in reverse order of seniority.  (Pl.'s LR Resp. ¶ 39.)

Larry did not volunteer to work any overtime that was posted, but was assigned to work overtime shifts on July 22, August 12, 13, 17, 19, and 25, and September 3, 2010, when she was the least senior employee.  (*Id.* ¶¶ 40-41.)  Larry knew she was assigned those times, but did not show up for these assignments because she believed the procedure Bagcraft had adopted was "illegal." (*Id.* ¶ 42.)  Larry testified that she understood the CBA to require management to ask her first if she wanted to voluntarily work certain overtime hours before putting up a notice allowing less-senior

11

employees to sign up. (Larry Dep. at 401-404.) She believed management should have done that before involuntarily assigning shifts. (*Id.*)

Larry admits that, under the union rules, an employee is not permitted to refuse a work assignment, including an overtime assignment. (Pl.'s LR Resp. ¶ 43.) Employees must perform the assignment, then file a grievance if they take issue with the assignment. Larry is aware of that rules but believes the rules are "unlawful." (*Id*. ¶ 43.) Sims testified that Larry was treated like all other employees with respect to the involuntary overtime assignments. (Sims Dep. at 124.)

For each overtime assignment Larry missed, she received a "point" under Bagcraft's attendance policy (six total); employees with eight points were terminated under the attendance policy. (Pl.'s LR Resp. ¶ 42.) Larry submitted a number of union grievances filed by other Bagcraft employees in late August and early September 2010 complaining that they had been unjustly disciplined for failure to work overtime and seeking the removal of attendance points they had accrued. (Pl.'s LR Ex. 26.) Many of those grievances were later withdrawn pursuant to a "Letter of Understanding" between Bagcraft and the Union, although it is unclear from the letter why certain employees' grievances were withdrawn and not others. (Pl.'s LR Resp. ¶ 43; Pl.'s LR Ex. 28.) Larry filed a grievance on September 7, 2010 stating she "could not work overtime[,] unjustly disciplined in violation of contract." (Pl.'s LR Resp. ¶ 44; Pl.'s LR Ex. 26.)

### 4. *Meeting on September 15, 2010 and the "poly" incident*

Larry was assigned another overtime shift for September 16, 2010, set to begin at 3 a.m., before her regular 7 a.m. shift started. (Pl.'s LR Resp. ¶ 44.) Larry complained to Carreon that she had been assigned the earlier overtime slot, rather than first being asked if she wanted the slot that

began after her normal shift, from 3 to 6 p.m. (*Id.*) Carreon directed her to speak to Wisniewski, which she did. (*Id.* ¶¶ 44, 46.) Wisniewski informed Larry that a less-senior employee had volunteered for the 3 to 6 p.m. shift, and in addition that they needed someone with experience on the 3 a.m. shift. (*Id.* ¶ 46.) Larry testified that she told Wisniewski that she had not been properly assigned to the shift and that she should have been asked before the more junior employees what shift she wanted, and that the junior employee should be bumped from the spot. (*Id.*; Larry Dep. at 414-18.) The parties dispute the tone of the ensuing conversation – Larry admits that she questioned Ms. Wisniewski several times as to why she was assigned this overtime shift, to which Wisniewski repeated the same answer three to six times. (Pl.'s LR Resp. ¶ 48.) Wisniewski testified that Larry spoke in a loud, aggressive, and belligerent manner, and stood up and aggressively pointed her finger at Wisniewski, which Larry denies. (Wisniewski Dep. at 147.)

Wisniewski directed Larry and Sims, also present, to return to work, and told Larry that she would be suspended if she did not. (*Id.* ¶ 51.) Larry got up to leave, but continued to question Wisniewski about the overtime assignment. (*Id.*) Wisniewski says she told Larry she was going to be suspended, and called in Lueth. (*Id.* ¶ 52; Wisniewski Dep. at 147-48.) Lueth ordered Larry and Sims to return to work, and the meeting ended. (Pl.'s LR Resp. ¶ 52.) Lueth and Wisniewski thereafter reported to Dan Vice, Bagcraft's Vice President of Operations, and Jo LeMoine, Human Resources Director, that Larry had been insubordinate, and received permission to suspend her. (*Id.* ¶ 53.)

When Larry returned to work following the meeting, she reported back to the machine she had been operating that day. (*Id.* ¶ 54.) The machine required a roll of paper and roll of a clear "poly" material to make Bagcraft's food bags with a window. (*Id.* ¶ 55.) If either material ran out,

13

the glue used to adhere the two materials would stick to the machine, causing a messy cleanup process and potentially damaging the machine. (*Id.*) Bagcraft employees were trained to monitor these rolls and replace them when they ran low. (*Id.*) It is undisputed that at the end of Larry's shift, the poly on the machine she had been working on ran out. (*Id.* ¶ 56.) The parties dispute who was responsible. Bagcraft asserts that Larry was still at the machine when the poly ran out, and told the operator for the 3:00 p.m. shift, Lee Longoria, that "it looks like you have a mess to clean up" when he came on, and then walked away without offering to help. (Def.'s LR Stmt. ¶ 58.) Larry testified that she left the machine at that time to finish up some other required work, and that Longoria had taken over the machine, and responsibility for the poly, at the time it ran out. (Larry Dep. at 440-42.) The poly running out indisputably left it inoperative for some length of time. (Pl.'s LR Resp. ¶ 59.)

The poly incident was reported to Carreon, who got to the machine not long after 3:00 p.m. and took pictures of the empty poly roll. (*Id.* ¶ 61.) Carreon asked Longoria what happened, who stated that he came to the machine around 2:50 p.m while Larry was writing a report and began helping her by closing up boxes, at which point he noticed that the poly was out on the machine. (*Id.* ¶ 62; Pl.'s LR Ex. 32.) Carreon took down Longoria's statement and gave it to Wisniewski. (*Id.*) Carreon also interviewed Ruben Benigno, second shift lead, who saw nothing but reported that Longoria told him that Larry "allowed the poly to run out." (Pl.'s LR Resp. ¶ 62.)

Management interviewed Larry the following day, on September 16, and she told them the poly had run out but that it was Longoria's responsibility, not hers. (*Id.* ¶ 63.) Larry provided a written statement in which she stated that "Andy" had requested she complete a production report at the end of her shift. (*Id.* ¶¶ 63, 64.) Andy Rivera, first shift lead, provided a statement that he arrived after the poly had run out and asked Larry to complete the report at that time. (*Id.* ¶ 67.)

14

After considering all of these reports, management concluded that the poly roll ran out between 2:50-2:55 p.m., during Larry's shift and while she was responsible for the machine. (*Id.* ¶ 68.) They concluded that her failure to do so was either intentional or a gross dereliction of duty. (*Id.* ¶ 69.)

Larry was issued two written Disciplinary Notices on September 16, one stating that she was suspended for raising her voice and arguing at the September 15 meeting, and one for "willful negligence" in letting the poly run out, for which she was suspended "indefinitely." (*Id.* ¶¶ 63, 68; Pl.'s LR Ex. 16 at Ex. B.) Bagcraft submitted testimony from Lueth, Wisniewski, Laywell, and Davis that other employees had been disciplined for not attending to the poly roll. (Def.'s LR Stmt. ¶ 71.) Larry submitted declarations and testimony from several Bagcraft employees who testified that the poly frequently ran out and employees were not often disciplined for it. (Pl.'s LR Resp. ¶ 71.)

Lueth testified that due to the poly incident, Larry's loud and aggressive behavior, Larry walking away from her work area, and her refusal to follow directions, he made a recommendation to Bagcraft corporate officers that Larry be terminated, which was approved. (Def.'s LR. Stmt. ¶ 72; Lueth Dep. at 130-31.) On September 21, 2010, Larry met with Lueth and Wisniewski, who told her she was being terminated. (*Id.* ¶ 73.) Joe Sims, who was also present at the September 21 meeting, testified that Lueth told Larry she was being fired for negligence. (Pl.'s LR Resp. ¶ 72; Sims Dep. at 179-80.) In a letter from Lueth to Larry dated that same day, Lueth cited the April 6, July 26, and September 15 disciplinary notices as reasons for her termination. (Pl.'s LR Ex. 40.)[5]

---

[5] Bagcraft has submitted statements of fact related to Larry's alleged failure to mitigate her damages, citing to jobs she was offered but turned down. (Def.'s LR Stmt. ¶¶ 76-79.) These facts might be relevant to the issue of damages but are not relevant on in a motion for summary judgment as to liability.

## LEGAL STANDARD

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id.* at 255. The court may not make credibility determinations, "choose between competing inferences," or weigh the evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 770 (7th Cir. 2005); *accord Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009). While the moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in its favor, once it has met this burden the non-moving party must designate specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *accord Celotex*, 477 U.S. at 323-24.

## DISCUSSION

### A.    Hostile Work Environment - Sexual Harassment

It is unlawful for an employer to discriminate against an individual with respect to hiring, discharge, or employment terms and conditions because of that person's sex. 42 U.S.C. § 2000e–2(a)(1). A sexually hostile or abusive work environment is a form of sex discrimination under Title VII. *EEOC v. Mgt. Hospitality of Racine, Inc.*, 666 F.3d 422, 432 (7th Cir. 2012) (*citing*

16

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)).  To maintain an actionable claim under this theory, Larry must demonstrate that: (1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her sex; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability. *Passananti v. Cook County*, 689 F.3d 655, 664 (7th Cir. 2012).  In determining whether contested conduct is severe and pervasive enough to create an "abusive working environment," a court considers "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 862 (7th Cir. 2011) (internal quotations omitted).  This assessment is made from both objective and subjective viewpoints. *Passananti*, 689 F.3d at 667-68.

The threshold for a plaintiff in a sexual harassment case is "high," as a workplace that is actionable is one that is "hellish." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005). Although a bright line does not exist separating innocuous from actionable behavior, the Seventh Circuit has made clear that "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers" generally does not create a work environment that a reasonable person would find intolerable. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995).  On the other hand, "sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; [and] pornographic pictures" are examples of conduct that can make the workplace "hellish." *Id.* at 430-431.  By way of example, the Seventh Circuit has held that the following conduct did *not* rise to the severe or pervasive level: a supervisor who inquired about the color of a plaintiff's bra and underwear, suggestively asked if he could make a "house call" when she called

17

in sick, and pulled back her tank top (*McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004)); a supervisor who rubbed a plaintiff's back and touched her shoulder on two occasions and stared at her chest while conducting a uniform inspection (*Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463-64 (7th Cir. 2002)); a supervisor who grunted when a plaintiff wore a skirt, told her the office was "hot" with her around, suggested that "all pretty girls run around naked," and made gestures to suggest masturbation (*Baskerville*, 50 F.3d at 430-31).

Viewing the evidence in the light most favorable to Larry, the conduct alleged here was not severe or pervasive enough that it could have created an objectively hostile work environment. The cumulative behavior on the part of Carreon that could be construed to be of a sexual nature amounted to an offer to buy Larry cologne, one or possibly two incidents where he complimented her shirt while staring at her breasts, one incident where he asked if she dated Mexican men, and one incident where he offered to take her out for her birthday. These incidents are less offensive than the behavior in the cases discussed above, and were isolated events that occurred over a period of time. Moreover, Larry admitted that, while Carreon made her uncomfortable, his behavior did not interfere with her ability to do her job, and that he never physically touched her.

Larry also alleged that Carreon made repeated offers to help "make things easier" for her, and that he hung around her machine more than he did other workers. Larry's primary focus in her response brief is that this behavior, taken with his other comments, was pervasive conduct that suggested he could use his power as her supervisor to "give her special favors if she gave in to his romantic and sexual requests" or to "use his power to punish her in the workplace if she refused him . . . ." (Pl.'s Oppn. at 2-3.) [Dkt 42.] But nothing in the record supports such an inference. Larry points to no evidence that Carreon ever suggested to Larry through his words or behavior that he

18

would use his position of authority against her if she did not "give in" to his requests.  Moreover,

Larry points to no evidence in the record that this behavior actually made her feel intimidated – she

highlights no testimony or statements suggesting she feared Carreon would use his position against

her.  In fact, Larry testified in her deposition that she did not think it was inappropriate when Carreon

told her he could "make things easy for" her and arranged for her to have assistance from other

machine operators, and that she thought it was funny that he offered to help her because he did not

actually know how to operate the machines.  (Larry Dep. at 232-34.)  Although Carreon's hanging

out around her machine might have made Larry subjectively uncomfortable, it cannot objectively be

found to have created a hostile work environment.[6]

Larry cites two cases to support her position that Carreon's behavior was objectively

offensive: *Doe v. Oberweis Dairy*, 456 F.3d 704, 717 (7th Cir. 2006), and *Dey v. Colt Const. & Dev.

Co.*, 28 F.3d 1446, 1456 (7th Cir. 1994).  (Pl.'s Resp. at 3.)   Those cases are so inapposite that they

do nothing to bolster Larry's claim.   In *Doe*, summary judgment for the defendant was reversed

because a fact issue remained as to liability where the teenage plaintiff's adult supervisor invited her

out to dinner and had sex with her before she reached the legal age of consent.  If the jury accepted

---

[6] Bagcraft argues that Larry's claim that she felt Carreon could use his authority against her
is based, in part, on her view that Carreon was her supervisor.  Bagcraft contends that Carreon was
not in fact Larry's "supervisor" under Title VII.  (Def.'s Reply at 6-7.)  [Dkt 48.]  That is an issue
frequently considered in determining the basis for employer liability in a sexual harassment case
(strictly liable for a supervisor's conduct, but a negligence standard for co-worker harassment), as
it was in the case Bagcraft cites, *Vance v. Ball State U.*, 646 F.3d 461, 470 (7th Cir. 2011).  Even
assuming, *arguendo,* that Carreon was her supervisor, however, it is irrelevant given that the conduct
of which Larry complains is not actionable under Title VII.

Likewise, Larry argues at length that Bagcraft's investigation of the sexual harassment claims
was "deeply flawed."  (Pl.'s Resp. at 4-7.)  Because the conduct Larry complains of does not rise to
an actionable level, however, it is not necessary to consider that argument in deciding the present
motion.

the plaintiff's evidence that she consented to sex for fear of losing her job, there could be a finding of actionable sexual harassment. *Doe*, 456 F.3d at 717. The facts and reasoning in *Doe* do nothing for the analysis here – the behavior of the defendant there amounted to an adult man allegedly coercing an underage girl into sexual relations – which is markedly different from any accusations Larry makes about Carreon.

In *Dey*, summary judgment was reversed in part because the plaintiff was subject to daily comments, gestures, and innuendo of an explicit sexual nature, although she could not recall each instance with specificity. *Dey*, 28 F.3d at 1456. Here, no evidence suggests Carreon made such explicit comments at all, and certainly not on a daily or even frequent basis. Thus, neither the facts nor the rationale in either case lends any further support to Larry's position that Carreon's behavior was objectively offensive.

Bagcraft's motion for summary judgment is granted as to Larry's sexual harassment claim.

**B.    Retaliation**

Title VII also makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]" or who has or who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e–3(a). Retaliation may be established by either the direct or indirect methods of proof. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). To establish retaliation under the direct method, a plaintiff must show that: (1) she engaged in activity protected by Title VII; (2) the defendant took an adverse employment action against her; and (3) there was a causal connection between her protected activity and the adverse

employment action.  *Id.*  The first two elements are not in dispute – Larry filed an internal complaint at Bagcraft as well as formal EEOC charges, and the disciplinary actions and termination were adverse employment actions.  The question remains whether the evidence supports an inference that there was a causal connection between the two.

A plaintiff can establish causation by showing that her complaints and EEOC filings were a "substantial or motivating factor" in the defendant's decision to take an adverse employment action against her.  *Coleman*, 667 F.3d at 860.  This may be done via direct evidence, which would "entail something akin to an admission by the employer."  *Id*. (internal quotations omitted).  It can also be done by presenting  "convincing mosaic of circumstantial evidence that would permit the same inference without the employer's admission."  *Id.* (internal quotations omitted).  No evidence has been presented of an admission of retaliation by Bagcraft; rather, Larry relies on a mosaic of circumstantial evidence to establish her claim.  (Pl.'s Resp. at 7-13.)[7]

A plaintiff has three categories of circumstantial evidence available when using the "convincing mosaic" approach.  *Coleman*, 667 F.3d at 860. One includes "suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of retaliatory intent might be drawn."  *Id.*  (internal quotations omitted).  Another is "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently."

---

[7] Bagcraft analyzes Larry's burden on her retaliation claim under the indirect burden-shifting approach, which provides a plaintiff an alternate avenue from the direct method to prove her claim. (Def.'s Mem. at 9-14.)  Under that approach, the plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she performed her job according to the employer's expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees.  *Vance v. Ball State U.*, 646 F.3d 461, 473 (7th Cir. 2011).  As Larry has not attempted to demonstrate an issue of disputed material fact using the indirect method, it will not be addressed.

*Id.* (internal quotations omitted). The third is "evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* (internal quotations omitted). Depending on how strong it is, each type of evidence may be sufficient by itself to support a judgment for the plaintiff, or they can be used together. *Id.* "Under the convincing mosaic approach, a retaliation case can be made by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction." *Id.* at 862 (internal citation omitted).

Here, Larry has failed to construct a mosaic adequate to survive summary judgment.

### 1.    *Timing*

"It is well established that 'mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue.'" *Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012) (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2012)). Here, Larry contends that because "three of the four" disciplinary events that lead to her firing occurred within months after she started to complain about Mr. Carreon's harassment, the timing of her termination was suspicious. (Pl.'s Mem. at 8.) Larry's claim of suspicious timing is undermined by the fact that even her own brief implicitly acknowledges that her disciplinary problems started *before* she engaged in any protected activity. As such, the timing of Larry's various disciplines provides little, if any, support in establishing a causal connection between the protected activity and her adverse employment action. *See Leonard v. Eastern Ill. Univ.,* 606 F.3d 428, 432

(7th Cir. 2010) (observing that for "a suspicious- timing retaliation theory . . . the theory doesn't work if the retaliatory act *precedes* the protected activity" (emphasis in original)).[8]

### 2.    *Disparate Treatment*

Larry claims that she was disparately treated because other employees were not terminated or disciplined for letting the poly roll run out.  (Pl.'s Mem. at 9-10.)  Larry points to statements from other employees attesting to the fact that the poly roll runs out frequently and that employees were rarely disciplined for such an occurrence.  (*Id.*)  To serve as comparators, "[s]imilarly situated employees, 'must be directly comparable to the plaintiff in all material respects,' but they need not be identical in every conceivable way." *Coleman,* 667 F.3d at 846.  Here, Larry has failed to provide sufficient information that would allow for a meaningful comparison among Larry and the other employees who let the poly roll run out.  Specifically, Larry has presented no evidence as to the disciplinary history of any of these other employees.  Bagcraft contends that Larry's termination was not based solely on the poly incident but also on the three other preceding disciplinary events.  Thus, without knowing the relevant disciplinary histories of the other employees, a retaliatory motive cannot be inferred.  *See Amrheim v. Health Care Servs. Corp.*, 546 F.3d 854, 860 (2008) (rejecting comparators because there was a disparity in the disciplinary history when termination was undisputedly based in part on disciplinary history).

---

[8]  The second of the four disciplinary actions – the written warning for insubordination for Larry's confrontation with management over her parking in the corporate parking lot – was given on July 26, 2010, more than two months after she complained to Wisniewski about Carreon's alleged harassment.  Larry filed her EEOC complaint two days *later*, on July 28, 2010.

### 3. *Pretext*

Larry also attempts to show that Bagcraft's reasons for Larry's termination were pretextual. In order to show pretext, Larry "'must present evidence suggesting that the employer is dissembling.'" *Coleman*, 667 F.3d at 852 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 657 (7th Cir. 2011)). "'It is not the court's concern's that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning it was a lie.'" *Id.* (quoting *Naik v. Boehringer Ingelheim Pharms., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010)).

First, Larry attempts to show pretext by characterizing Bagcraft's explanations for Larry's termination as "shifting." (Pl.'s Mem. at 11-12.) "Shifting and inconsistent explanations can provide a basis for a finding of pretext. But the explanations must actually be shifting and inconsistent to permit an inference of mendacity." *Schuster v. Lucent Techs. Inc.,* 327 F.3d 569, 577 (7th Cir. 2003) (internal citations omitted). As laid out in its September 21, 2010 letter, Bagcraft terminated Larry because of four 2010 disciplinary violations. (Pl.'s LR Ex. 40.) Larry contends that in its October 2010 letter to the EEOC (Pl.'s LR Ex. 41, Bagcraft's EEOC Letter), Bagcraft mentioned "for the first time" that Larry had been written up for insubordination on multiple occasions in the 1990's, and that Larry had refused to work overtime on multiple occasions. (Pl.'s Mem. at 12-13.) Contrary to Larry's assertion, however, Bagcraft's statements do not demonstrate any inconsistency. Bagcraft's letter to the EEOC discussed Larry's refusal to work overtime because Larry's EEOC charge accused Bagcraft of *denying* her overtime. (Pl.'s LR Ex 14.) As for the prior incidents of insubordination, Bagcraft did not assert that the prior incidents rather than the four 2010 incidents lead to her termination. (*See* Bagcraft's EEOC Letter at 3 ("In 2010, however, Larry's

insubordination reached new levels, eventually leading to her termination.").) That Bagcraft raised the prior incidents demonstrates, at most, that Bagcraft was "committed to an aggressive defense of its actions, perhaps leading it to occasionally over-defend itself," but does not provide any support for an inference that Larry was terminated for a reason other than the four disciplinary violations in 2010. *Schuster,* 327 F.3d at 579.

Larry's contentions that Bagcraft's pretext is demonstrated in its characterization in its EEOC letter of Larry's conduct with regard to the poly roll as "intentional" rather than negligent and of the April 6th incident as "insubordination" also miss the mark. (Pl.'s Mem. at 12-13.) Although the language in Bagcraft's EEOC letter may be more emphatic than that used in its September 21 letter to Larry, the factual details of Larry's described behavior are consistent in both letters. *See Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1146 (7th Cir. 1994) (finding that changes in word choice but not substance in describing reason for termination does not demonstrate pretext).

Larry further contends that. Lueth's seemingly unprovoked questioning of Larry's parking spot, his refusal to listen to Larry's explanations, and his purported desire to have her terminated demonstrate a retaliatory motive.[9] (Pl.'s Mem. at 8-9, 13-14.) There is no evidence, however, that Lueth's animus toward Larry was in retaliation for her complaints of sexual harassment. The evidence in the record suggests that, if anything, Lueth's anger at Larry carried over from Larry's behavior during the April 6th incident when Larry left her machine without permission. (*See* Sims Dep. at 108, 116). Any retaliation for the April 6th incident, however, is not actionable under Title

---

[9] Larry also argues that asking her to move her car from the handicapped spot was unlawful under Illinois law and federal law. (Pl.'s Mem. at 13-14.) Larry, however, voluntarily dismissed her disability claims, *see* note 1, *supra,* and whether Bagcraft's actions were illegal under applicable disability laws is irrelevant to her Title VII retaliation claim.

VII because Larry's actions with regards to that incident did not constitute activities protected by Title VII. *See, e.g., Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 848-49 (7th Cir. 2009).

Lastly, Larry complains that she was "presumed guilty" for letting the poly roll run out, that management decided to fire Larry before the investigation had been completed, and that the investigation into the incident was a sham "developed to put the blame solely on" Larry. (Pl.'s Mem. at 10-12.) Larry, however, admits that "management determined that the poly roll ran out around 2:50 p.m. - 2:55 p.m., during Larry's shift, and while she had responsibility for [the machine]." (Pl.'s LR Resp. ¶ 68.) Larry also admits that Lueth and Wisniewski "believe[d] Larry intentionally allowed the poly roll to run out while the machine was operating." (*Id.* ¶ 69.) Thus, regardless of whether Larry believes she was responsible, it is undisputed that management believed that Larry was at fault, and thus, the investigation does not suggest that Bagcraft's reason for Larry's termination was a pretext for retaliating against her for complaining about sexual harassment. *See Collins v. Am. Red Cross,* No. 11-3345, ___ F.3d ___, 2013 WL 856512 at *3 (7th Cir. Mar. 8, 2013) ("Title VII does not forbid sloppy, mistaken, or unfair terminations; it forbids discriminatory or retaliatory terminations.").

Accordingly, as Larry has failed to demonstrate an issue of material fact as to her retaliation claim, Bagcraft's motion for summary judgment is granted.

## CONCLUSION

For the foregoing reasons, Bagcraft's motion for summary judgment is granted. Judgment is entered in favor of defendant Bagcraft and against plaintiff Larry. Terminate case.

26

**IT IS SO ORDERED**.

_____
Geraldine Soat Brown
United States Magistrate Judge

**Dated:** March 20, 2013